IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ARTHUR WAYNE WHITE,

    Plaintiff,

    v.           Civil Action No. 2:09-CV-24

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.


## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.  <u>Background</u>

  Plaintiff, Arthur White (Claimant), filed a Complaint on February 2, 2009, seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant,

Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer on May 12,

2009.[2]  Claimant filed his Motion for Judgment on the Pleadings on June 11, 2009.[3]

Commissioner filed his Motion for Summary Judgment on July 10, 2009.[4]

B.  <u>The Pleadings</u>

    1.  <u>Plaintiff's Brief in Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 12.

[3] Docket No. 16.

[4] Docket No. 18.

2. <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C. <u>Recommendation</u>

I recommend that:

1. Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence for the ALJ to discredit Claimant's testimony and afford less than controlling weight to two treating physicians' opinions, and the ALJ properly posed a complete hypothetical to the VE.

2. Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.

## II. Facts

A. <u>Procedural History</u>

Claimant filed an application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) on February 24, 2006, alleging disability since February 16, 2006, due to a detached retina in his left eye, a heart condition, diabetes, gout, migraines, and depression. (Tr. 117, 134). The claim was denied initially on August 25, 2006, and upon reconsideration on January 11, 2007. (Tr. 75, 88). Claimant filed a written request for a hearing on January 31, 2007. (Tr. 94). Claimant's request was granted and a hearing was held on September 18, 2007. (Tr. 31-70).

The ALJ issued an unfavorable decision on November 5, 2007. (Tr. 15-30). The ALJ determined Claimant was not disabled under the Act because he had no impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d),

416.925 and 416.926), and there are jobs that exist in significant numbers in the national economy that the Claimant can perform (20 CFR 404.1560©, 404.1566, 416.960©, and 416.966). (Tr. 22-24). On November 15, 2007, Claimant filed a request for review of that determination. (Tr. 13). The request for review was denied by the Appeals Council on December 17, 2008. (Tr. 1). Therefore, on December 17, 2008, the ALJ's decision became the final decision of the Commissioner.

Having exhausted his administrative remedies, Claimant filed a Complaint with this Court seeking judicial review of the Commissioner's final decision.

B.    Personal History

Claimant was born on October 3, 1958, and was forty-seven (47) years old as of the onset date of his alleged disability and forty-nine (49) as of the date of the ALJ's decision. (Tr. 38). Claimant was therefore considered a "younger person," under the age of 50 and, generally, whose age will not seriously affect the ability to adjust to other work, under the Commissioner's regulations. 20 C.F.R. §§ 404.1563©, 416.963© (2009). Claimant graduated from high school and worked as a full-time truck driver for fifteen years and heavy machinery operator through 2005. (Tr. 40, 42-46).

C.    Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's determination that Claimant's subjective complaints were not entirely credible:

**Outpatient Surgery Records, Nabil Jabbour, M.D., 2/16/06 & 3/9/06 (Tr. 214-30)**

2/16/06 Outpatient Surgery Record
Preoperative Diagnosis: subchronic combined rhegmatogenous retinal detachment with

retinoschisis (multiple locations) and localized hemorrhage with extensive proliferative vitreoretinopathy, membranes and pigment deposits, left eye
Postoperative Diagnosis: same
Admitting Diagnosis: retinal detachment left eye

3/9/06 Outpatient Surgery
Preoperative Diagnosis: recurrent rhegmatogenous retinal detachment, left eye
Postoperative Diagnosis: same
Admitting Diagnosis: recurrent RRD-OS; scleral buckle revision left

**Morgantown Internal Medicine Group, Inc. 3/7/06 (Tr. 232)**
Echocardiogram
final impression: moderate concentric left ventricular hypertrophy with a normal contracting left ventricle; mitral configuration does suggest pour LV compliance; left atrium is enlarged; little or no mitral regurgitation present; aortic valve is slightly thickened, not stenotic or regurgitant; right sided dimensions and pressures are normal; no pericardial effusion.

**NG Cytopathology Report, Robert H. Swedarsky, M.D., 2/20/06 (Tr. 250)**
Final Diagnosis: left vitreous fluid, thinprep and cell block preparation; amorphous debris, retinal pigment epithelial cells, loose pigment granules, macrophages, few scattered lymphocytes, and neutrophils, red blood cells; disassociated fibromembranous tissue; lens debris; no malignant cells observed.

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 4/21/06-7/10/06 (Tr. 251-67 & 278-79)**
4/21/06
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow macular detachment - OS for which he successfully underwent PPV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS was observed for which he successfully underwent SB revision.
Interim History:       denies having any problems overnight
Impression:   successfully treated recurrent RRD-OS; successfully treated recurrent/progressive macular pucker and residual fluid and hemorrhage - OS

5/1/06
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow macular detachment - OS for which he successfully underwent PPV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he successfully underwent SB revision with total reattachment. Developed recurrent/progressive pucker-OS for which he successfully underwent PPV+ endolaser-OS.
Interim History:       vision in left eye has improved slightly

5/1/06 Eye Exam

Comments:     good early visual recovery - OS
impression:   successfully treated recurrent RRD-OS; successfully treated recurrent/progressive
              macular pucker and residual fluid and hemorrhage-OS


5/22/06
Summary:      diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
              macular detachment - OS for which he successfully underwent PPV + SB-OS
              followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS
              developed for which he successfully underwent SB revision with total
              reattachment. Developed recurrent/progressive pucker-OS for which he
              successfully underwent PPV+ endolaser-OS with good early visual recovery.
Interim History:     vision in his left eye may have improved a little bit but noticing a dark
              spot (inferiorly) and spots with missing vision (centrally).


5/22/06 Eye Exam
Impression:   successfully treated recurrent RRD-OS; successfully treated recurrent/progressive
              macular pucker and residual fluid and hemorrhage-OS


5/31/06
Summary:      diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
              macular detachment - OS for which he successfully underwent PPV + SB-OS
              followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS
              developed for which he successfully underwent SB revision with total
              reattachment. Developed recurrent/progressive pucker-OS for which he
              successfully underwent PPV+ endolaser with good early visual recovery.
Interim History:     "blank area" symptoms have slowly progressed; has temporal peripheral
              vision in his left eye.


5/31/06 Eye Exam
Comments:     vision-OS obtained in the temporal periphery
Impression:   recurrent RRD-OS; S/P successfully treated recurrent/progressive pucker and
              residual fluid and hemorrhage-OS


6/2/06
Summary:      diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
              macular detachment - OS for which he successfully underwent PPV + SB-OS
              followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS
              developed for which he successfully underwent SB revision with total
              reattachment. Developed recurrent/progressive pucker-OS for which he
              successfully underwent PPV+ endolaser with good early visual recovery. Again
              observed with recurrent RRD-OS for which he underwent pneumatic retinopexy.
Interim History:     vision in left eye is a little bit better.


6/2/09 Eye Exam

Comments:    patient not doing head down-positioning well: promised to do better
Impression:  treated recurrent RRD-OS

6/5/06
Summary:    diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
            macular detachment - OS for which he successfully underwent PPV + SB-OS
            followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS
            developed for which he successfully underwent SB revision with total
            reattachment.  Developed recurrent/progressive pucker-OS for which he
            successfully underwent PPV+ endolaser with good early visual recovery.  Again
            observed with recurrent RRD-OS for which he underwent pneumatic retinopexy
            followed by a decrease in subretinal fluid.
Interim History:    vision in his left eye has improved

6/5/06 Eye Exam
Impression:  treated recurrent RRD-OS

6/6/06
Summary:    diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
            macular detachment - OS for which he successfully underwent PPV + SB-OS
            followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS
            developed for which he successfully underwent SB revision with total
            reattachment.  Developed recurrent/progressive pucker-OS for which he
            successfully underwent PPV+ endolaser with good early visual recovery.  Again
            observed with recurrent RRD-OS for which he underwent staged pneumatic
            retinopexy.
Interim History:    denies having any visual acuity changes in his left eye but reports that
                    dark spot is not down in front of the vision.


6/6/06 Eye Exam
Comments:    stressed face down positioning
Impression:  treated recurrent RRD-OS

6/9/06
Summary:    diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow
            macular detachment-OS for which he successfully underwent PPV + SB-OS
            followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS
            developed for which he successfully underwent SB revision with total
            reattachment.  Developed recurrent/progressive macular pucker-OS for which he
            successfully underwent PPV + endolaser with good early visual recovery.  Again
            observed with recurrent RRD-OS for which he underwent staged pneumatic
            retinopexy followed by a progressive decrease in subretinal fluid.
Interim History:    reports vision in left eye is "clearer;" however on 6/6/06 he moved an

object that weighed 100 lbs and noticed a "couple of flashes" which lasted only a couple seconds and has not experienced them since.

7/10/06

Summary:    diagnosed with vitreoretinal degeneration, schisis-OU, chronic RRD and shallow macular detachment - OS for which he successfully underwent PPV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he successfully underwent SB revision with total reattachment. Developed recurrent/progressive pucker-OS for which he successfully underwent PPV+ endolaser with good early visual recovery. Again observed with recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Again observed with recurrent RRD-OS for which he successfully underwent PPV+endolaser

Interim History:    denies having any visual acuity change in left eye but reports having occasional sharp pain, burning, and tearing.

7/10/06 Eye Exam

Impression:    treated recurrent RRD-OS

**Operative Report, Nabil Jabbour, M.D., 6/29/06 (Tr. 268-74)**

Preoperative Diagnosis:    recurrent rhegmatogenous retinal detachment, left eye
Postoperative Diagnosis:    same

**Treadmill Exercise Test, Juan Alicea, M.D., 5/16/06 (Tr. 280-81)**

Results:    results are negative for [illegible]; multiple risk factors at this time.

**Physical Residual Functional Capacity Assessment, Fulvio Franyutti, M.D., 7/12/06 (Tr. 282-90)**

Exertional Limitations
• occasionally lift: 20 pounds
• frequently lift: 10 pounds
• stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
• sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
• push and/or pull (including operation of hand and/or foot controls): unlimited

Postural Limitations
• climbing ramp/stairs: occasionally
• climbing ladder/rope/scaffolds: never
• balancing: occasionally
• stooping: occasionally
• kneeling: occasionally
• crouching: occasionally
• crawling: occasionally

Manipulative Limitations

- None

Visual Limitations
- None
- note: Patient had surgeries in the left eye, and his vision has improved

Communicative Limitations
- None

Environmental Limitations
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid concentrated exposure

Symptoms
no problem with personal care; prepares simple meals; sweeps and does laundry daily; does not drive due to vision problems; grocery shops once a week; has trouble lifting, squatting, bending, reaching, kneeling, seeing, following instructions and getting along with others; states can walk about 400 yards before stopping to rest for 10 minutes; states he uses crutches when he gets gout. Patient is credible.

**Psychiatric Review Technique, Philip Comer, Ph.D., 7/14/06 (Tr. 292-305)**
Medical Summary
- Medical Disposition: no medically determinable impairment

Consultant's Notes: Claimant does not mention any allegations of mental conditions but on his Pain questionnaire he stated that he has mood swings. Not currently seeing any doctors or taking any medications for it. No problem with personal care. Prepares simple meals. Sweeps and does laundry daily. Does not drive due to vision problems. Grocery shops once a week. Has trouble: lifting, squatting, bending, reaching, kneeling, seeing, following instructions, & getting along with others. Can walk about 400 yards before resting for 10 minutes. States he uses crutches when he gets Gout. Able to handle own finances. Does not handle stress well. No documentation supporting mental illness or treatment thereof.

**West Virginia Disability Determination Service, Kip Beard, M.D., 8/10/06 (Tr. 306-11)**
Chief Complaint:     detached retina, diabetes, heart problems and gout
Impression:          diabetes mellitus type 2; left retinal detachment, status post multiple
                     surgeries due to recurrent retinal detachment; chest discomfort, atypical
                     for angina; left ventricular hypertrophy, according to echocardiogram;
                     history of gout.


**Physical Residual Functional Capacity Assessment, Fulvio Franyutti, M.D., 8/18/06 (Tr. 312-20)**

<u>Exertional Limitations</u>
- occasional lift: 20 pounds
- frequently lift: 10 pounds
- stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
- push and/or pull: unlimited

<u>Postural Limitations</u>
- climbing ramp/stairs: occasionally
- climbing ladder/rope/scaffolds: never
- balancing: occasionally
- stooping: occasionally
- kneeling: occasionally
- crouching: never
- crawling: never

<u>Manipulative Limitations</u>
- none

<u>Visual Limitations</u>
- depth perception: limited
- field of vision: limited
- note: patient is S/p lt. Vitrectomy, endolaser & endocryoth. with gas instr. for retinal re-attachment, currently patient has lt. eyelid ptosis & limitations.

<u>Communicative Limitations</u>
- none

<u>Environmental Limitations</u>
- extreme cold: avoid concentrated exposure
- extreme heat: avoid concentrated exposure
- wetness: unlimited
- humidity: unlimited
- noise: unlimited
- vibration: avoid concentrated exposure
- fumes, odors, dusts, gases, poor ventilation: unlimited
- hazards: avoid even moderate exposure

<u>Symptoms</u>:  No problem with personal care.  Prepares simple meals.  Sweeps and does laundry daily.  Does not drive due to vision problems.  Grocery shops once a week.  Has trouble: lifting, squatting, bending, reaching, kneeling, seeing, following instructions, & getting along with others.  Can walk about 400 yards before resting for 10 minutes.  States he uses crutches when he gets Gout.  Does not have chest pain.  Patient is credible.

**<u>Outpatient Surgery Records, Monongalia General Hospital, Nabil Jabbour, M.D., 10/12/06 (Tr. 332-40)</u>**
Admitting Diagnosis: recurrent hypotony; vitrectomy left
Procedure:      PPV-OS under MAC
Preoperative Diagnosis:      recurrent RRD with minimal PVR and hypotony, left eye
Postoperative Diagnosis:      same

**Outpatient Surgery Records, Monongalia General Hospital, Nabil Jabbour, M.D., 8/24/06 (Tr. 341-49)**
Admitting Diagnosis: vitrectomy left
Preoperative Diagnosis:    recurrent rhegmatogenous retinal detachment and proliferative vitreoretinopathy with subretinal fibrosis and cataract, left eye
Postoperative Diagnosis:    same

**Outpatient Surgery Records, Monongalia General Hospital, Nabil Jabbour, M.D., 6/29/06 (Tr. 350-61)**
Admitting Diagnosis:    vitrectomy left
Preoperative Diagnosis:    recurrent rhegmatogenous retinal detachment, left eye
Postoperative Diagnosis:    same

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 12/20/06 (Tr. 364-67)**
Comments:    vision-OS obtained with +10 lens
Impression:    severe vitreoretinal degeneration-OU with schisis-OD; recurrent RRD and PVR-OS
Summary:    diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS. Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which he underwent additional gas x3 and additional laser followed by reattachment. Recurrent RRD-OS was again observed with progression noted but patient wanted to wait on treatment.
Interim History:    denies having any visual change in right eye but reports seeing "more flashes of light" in the left eye.

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 12/6/06 (Tr. 368-69)**
Comments:    vision-OS obtained with +10 lens
Impression:    recurrent RRD and PVR-OS
Summary:    diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS. Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional

pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which he underwent additional gas x3 and additional laser followed by reattachment. Recurrent RRD-OS was again observed with progression noted but patient wanted to wait on treatment.

Interim History:     denies having any visual change in left eye.

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 12/1/06 (Tr. 370-71)**

Comments:     discusses treatment options

Impression:     recurrent RRD and PVR-OS

Summary:     diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS. Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which he underwent additional gas x3 and additional laser followed by reattachment. Recurrent RRD-OS was again observed with progression noted but patient wanted to wait on treatment.

Interim History:     reports "rolling flashes" of light from left to right in the left eye for the past week.

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 11/17/06 (Tr. 372-74)**

Comments:     discussed treatment options

Impression:     recurrent RRD-OS

Summary:     diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS. Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which he underwent additional gas x3 and additional laser.

Interim History:     eye seems better.

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 11/8/06 (Tr. 375-76)**

Impression:     treated recurrent RRD-OS

Summary:     diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for
             which he underwent PPV+SB-OS followed by tiny choroidals and shallow
             subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB
             revision; then he developed recurrent/progressive macular pucker-OS for which
             he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which
             he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2,
             PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed;
             then, a localized fold of redetachment-OS was noted for which additional
             pneumatic retinopexy was performed followed by recurrent hypotony.
             Recurrence in inferior RRD-OS was again noted for which he underwent
             additional gas x3 and additional laser.
Interim History:     reports no visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 11/3/06 (Tr. 377)**
Impression:    treated recurrent RRD-OS

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/30/06 (Tr. 379-80)**
Impression:    treated recurrent RRD-OS
Summary:     diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for
             which he underwent PPV+SB-OS followed by tiny choroidals and shallow
             subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB
             revision; then he developed recurrent/progressive macular pucker-OS for which
             he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which
             he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2,
             PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed;
             then, a localized fold of redetachment-OS was noted for which additional
             pneumatic retinopexy was performed followed by recurrent hypotony.
             Recurrence in inferior RRD-OS was again noted for which gas was added and he
             successfully underwent PPV with total reattachment.  Recurrent RRD-OS was
             again noted for which gas was added.
Interim History:     reports no visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/27/06 (Tr. 381-82)**
Impression:    successfully treated hypotony-OS
Summary:     diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for
             which he underwent PPV+SB-OS followed by tiny choroidals and shallow
             subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB
             revision; then he developed recurrent/progressive macular pucker-OS for which
             he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which
             he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2,
             PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed;
             then, a localized fold of redetachment-OS was noted for which additional
             pneumatic retinopexy was performed followed by recurrent hypotony.
             Recurrence in inferior RRD-OS was again noted for which gas was added and he

successfully underwent PPV with total reattachment.  Recurrent RRD-OS was again noted for which gas was added.

Interim History:     reports vision in left eye has either "stayed same or improved"

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/23/06 (Tr. 383-84)**

Impression:    successfully treated hypotony-OS

Summary:    diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which gas was added and he successfully underwent PPV with total reattachment.

Interim History:     reports vision in left eye has improved

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/16/06 (Tr. 385-86)**

Impression:    successfully treated RRD-OS

Summary:    diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which gas was added and he successfully underwent PPV with total reattachment.  Recurrent RRD-OS was again noted for which gas was added.

Interim History:     denies having any visual acuity change in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/13/06 (Tr. 387-88)**

Impression:    successfully treated RRD-OS

Summary:    diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy.  Localized area of re-detachment was noted.  Relative

13

hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony.  Recurrence in inferior RRD-OS was again noted for which gas was added and he successfully underwent PPV with total reattachment.  Recurrent RRD-OS was again noted for which gas was added.

Interim History:       reports sharp stabbing pain and a burning sensation in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 10/2/06 (Tr. 390-92)**

Comments:      vision-OS obtained with +10 lens & eccentric fixation
Impression:    treated recurrent inferior RRD and PVR-OS; aphakia-OS; recurrent hypotony-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser additional gasx2, PPV + lensectomy, then additional gas-OS.  Relative hypotony-OS was observed; then, a localized fold of redetachment-OS was noted for which additional pneumatic retinopexy was performed followed by recurrent hypotony. Recurrence in inferior RRD-OS was again noted for which gas was added.

Interim History:       denies any visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/27/06 (Tr. 393-95)**

Comments:      vision-OS obtained with +10 lens & eccentric fixation
Impression:    treated recurrent inferior RRD and PVR with recurrence-OS; aphakia-OS; recurrent hypotony-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas.  Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment. Localized area of re-detachment-OS noted.  Relative hypotony-OS observed; then localized fold of redetachment-OS noted for which gas was added and additional pneumatic retinopexy was performed followed by recurrent hypotony.

Interim History:       reports vision in left eye is a "little clearer above the bubble"

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/20/06 (Tr. 396-97)**

Impression:    treated recurrent inferior RRD and PVR with recurrence-OS; aphakia-OS; recurrent hypotony-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow

subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas.  Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment.  Localized area of re-detachment-OS noted.  Relative hypotony-OS observed; then localized fold of redetachment-OS noted for which gas was added and additional pneumatic retinopexy was performed.

Interim History:       denies any visual change in left eye

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/13/06 (Tr. 398-400)

Impression:       treated recurrent inferior RRD and PVR with recurrence-OS; aphakia-OS; less hypotony-OS

Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas.  Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment.  Localized area of re-detachment-OS noted.  Relative hypotony-OS observed; then localized fold of redetachment-OS noted for which gas was added.

Interim History:       denies any visual changes in left eye

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/13/06 (Tr. 400-03)

Impression:       treated recurrent inferior RRD and PVR with recurrence-OS; aphakia-OS; less hypotony-OS

Summary:       diagnosed with vitreoretinal degeneration, schisis-OS and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser.  He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas.  Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment.  Localized area of re-detachment-OS noted for which gas was added; then relative hypotony-OS observed.

Interim History:       vision in left eye has improved inferiorly, but reports a gradual distortion in vision centrally since his last visit

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/5/06 (Tr. 404-06)

Impression:       treated recurrent inferior RRD and PVR with recurrence-OS; aphakia-OS; relative

hypotony-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas. Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment. Localized area of re-detachment-OS noted for which gas was added.

Interim History: denies any visual changes in left eye

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/1/06 (Tr. 407-08)

Impression: successfully treated recurrent inferior RRD and PVR-OS; aphakia-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas. Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment.

Interim History: denies any visual changes in left eye; extreme tenderness with occasional sharp pains

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 9/5/06 (Tr. 400-06)

Impression: successfully treated recurrent inferior RRD and PVR-OS; aphakia-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy, PPV + endolaser, and additional gas. Then, recurrent inferior RRD and PVR-OS were again observed for which he successfully underwent PPV + lensectomy-OS followed by total reattachment.

Interim History: denies any visual changes in left eye

### Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 8/25/06 (Tr. 412-14)

Comments: massive sheet of sub-retinal fibrosis seen causing multiple retinal folds and a GRT-OS; sub-retinal dissection carried and most of sheet removed

Impression: successfully treated recurrent inferior RRD and PVR-OS; aphakia-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD-OS for which he underwent PPV+SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent staged

pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added. Again observed with recurrent RD-OS for which he underwent PPV+ endolaser. Recurrent RRD-OS was observed again for which he underwent pneumatic retinopexy; then, persistent inferior RD-OS was observed for which he underwent pneumatic retinopexy. Then, recurrent inferior RRD and PVR-OS were again observed for which he was scheduled for surgery.

Interim History: reports mild pain, nausea & vomiting overnight

**Outpatient Surgery Records, Monongalia General Hospital, Nabil Jabbour, M.D., 8/24/06, (Tr. 415-16)**

Preoperative Diagnosis: recurrent rhegmatogenous retinal detachment and proliferative vitreoretinopathy with subretinal fibrosis and cataract, left eye

Postoperative Diagnosis: same

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 8/15/06 (Tr. 417-19)**

Impression: recurrent inferior RRD and PVR-OS; progressive cataract-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser. Recurrent RRD-OS was observed for which he underwent pneumatic retinopexy; then persistent inferior RD-OS was observed for which he underwent pneumatic retinopexy.

Interim History: denies any visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 8/4/06 (Tr. 420-22)**

Impression: successfully treated recurrent RRD-OS; progressive cataract-OS

Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser. Recurrent RRD-OS was observed for which he underwent pneumatic retinopexy; then persistent inferior RD-OS was observed for which he underwent pneumatic

retinopexy.
Interim History: denies any visual acuity changes in left eye but states that the dark area superiorly is a "little brighter"


**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/28/06 (Tr. 423-25)**

Impression: successfully treated recurrent RRD-OS
Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser. Recurrent RRD-OS was observed for which he underwent pneumatic retinopexy; then persistent inferior RD-OS was observed for which he underwent pneumatic retinopexy.
Interim History: denies any visual acuity changes in left eye but previously noticed a "black flickering spot"


**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/25/06 (Tr. 426-28)**

Impression: treated recurrent RRD with persistent inferior RD-OS
Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser. Recurrent RRD-OS was observed for which he underwent pneumatic retinopexy.
Interim History: denies any visual changes in left eye


**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/21/06 (Tr. 429-31)**

Impression: treated recurrent RRD-OS
Summary: diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid.

Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser. Recurrent RRD-OS was observed for which he underwent pneumatic retinopexy.

Interim History:       denies any visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/19/06 (Tr. 432-33)**
Impression:    recurrent RRD-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser.
Interim History:       vision in left eye has improved

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/10/06 (Tr. 434-35)**
Impression:    treated recurrent RRD-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser.
Interim History:       denies any visual acuity changes in left eye but reports having occasional sharp pains, burning, and tearing

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 7/3/06 (Tr. 436-37)**
Impression:    treated recurrent RRD-OS
Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he underwent PPV + endolaser.

Interim History:       vision in left eye may have improved slightly; reports sparkles and circles of light

## Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 6/30/06 (Tr. 438-39)

Impression:    successfully treated recurrent RRD-OS

Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision with total reattachment. Then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added; then, he was again observed with recurrent RRD-OS for which he was scheduled for surgery.

## Operative Report, Nabil Jabbour, M.D., 6/29/06 (Tr. 440-41)

Preoperative Diagnosis:       recurrent rhegmatogenous retinal detachment, left eye

Posteroperative Diagnosis:    same

## Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 6/28/06 (Tr. 442-43)

Impression:    treated recurrent RRD-OS; vitreoretinal degeneration with schisis-OD

Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added.

Interim History:       denies any visual changes in left eye but reports seeing a long "stringy" floater in the vision of his right eye

## Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 6/26/06 (Tr. 444-45)

Impression:    treated recurrent RRD-OS

Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and shallow macular detachment-OS for which he successfully underwent OV + SB-OS followed by tiny choroidals and shallow subretinal fluid. Recurrent RRD-OS developed for which he underwent SB revision; then he developed recurrent/progressive macular pucker-OS for which he underwent PPV + endolaser. He again developed recurrent RRD-OS for which he underwent staged pneumatic retinopexy followed by a progressive decrease in subretinal fluid. Seen with residual RD-OS for which more gas was added.

Interim History:       denies any visual changes in left eye

**Mid-Atlantic Retina Consultations, Inc., N.M. Jabbour, M.D., 6/23/06 (Tr. 446-47)**

Impression:    treated recurrent RRD-OS

Summary:       diagnosed with vitreoretinal degeneration, schisis-OU and chronic RRD and
               shallow macular detachment-OS for which he successfully underwent OV + SB-
               OS followed by tiny choroidals and shallow subretinal fluid.  Recurrent RRD-OS
               developed for which he underwent SB revision; then he developed
               recurrent/progressive macular pucker-OS for which he underwent PPV +
               endolaser.  He again developed recurrent RRD-OS for which he underwent staged
               pneumatic retinopexy followed by a progressive decrease in subretinal fluid.

Interim History:       denies any visual changes in left eye


**Physical Residual Functional Capacity Assessment, Porfirio Pascasio, M.D., 1/8/07 (Tr. 448-55)**

Exertional Limitations
•      occasional lift: 20 pounds
•      frequently lift: 10 pounds
•      stand and/or walk (with normal breaks) for a total of: about 6 hours in an 8-hour workday
•      sit (with normal breaks) for a total of: about 6 hours in an 8-hour workday
•      push and/or pull: unlimited

Postural Limitations
•      climbing ramp/stairs: occasionally
•      climbing ladder/rope/scaffolds: never
•      balancing: occasionally
•      stooping: occasionally
•      kneeling: occasionally
•      crouching: occasionally
•      crawling: occasionally

Manipulative Limitations
•      none

Visual Limitations
•      depth perception: limited
•      field of vision: limited

Communicative Limitations
•      none

Environmental Limitations
•      extreme cold: avoid concentrated exposure
•      extreme heat: avoid concentrated exposure
•      wetness: unlimited
•      humidity: unlimited
•      noise: unlimited
•      vibration: unlimited
•      fumes, odors, dusts, gases, poor ventilation: unlimited
•      hazards: avoid even moderate exposure

Symptoms: Agree with previous evaluation that Patient is credible.

**Ophthalmologist Report, Jenna Gongola, O.D., 2/14/07 (Tr. 456-60)**
Diagnosis:      retinal detachment OS; vitreoretinal degeneration OD; schisis OD
lost vision in left eye - light perception only
patient is not so impaired as to have difficulty concentrating his vision on an object
patient would not experience double vision
patient may experience loss of depth perception
no redness/irritation
no restrictions on amount of weight patient can lift
no restrictions on bending, stooping, or crawling

**Letter from Nabil Jabbour, M.D., 1/22/07 (Tr. 462)**
"[Claimant] has had a very complicated series of detachments that have necessitated multiple
surgeries . . . . His condition qualifies him for full disability for at least this past year (February
2006 to present) and his recovery is still not over yet."

**Letter from Jenna Gongola, O.D., 1/23/07 (Tr. 463)**
"[Claimant] has had a very complicated series of retinal detachments that began in February
2006. . . . His condition qualifies him for full disability for at least this past year and his recovery
is not complete."

**Letter from Farukh Khan, M.D., 1/27/07 (Tr. 464)**
"I sincerely believe that [Claimant] should qualify for disability over the past year and
continued, and also future."

**Ophthalmologist Report, Nabil Jabbour, M.D., 2/16/07 (Tr. 465-69)**
Diagnosis:      chronic rhegmatogenous retinal detachment-OS; hypotony-OS; vitreoretinal
                degeneration; schisis-OU
remaining vision in right eye: 20/20
Claimant can only see movement through left eye
Claimant would have difficulty focusing, concentrating on an object, reading, appreciating
depth.
Claimant would not experience double vision
Claimant would experience redness/irritation
Claimant is not restricted in amount of weight lifted or bending, stooping, or crawling.

**Mid-Atlantic Retina Consultations, Inc., Nabil Jabbour, M.D., 3/19/07 (Tr. 470-71)**
Interim History:      complaints of "cobweb" in right eye in lower part of vision.  Denies
                      having light flashes
Impression:           progressive vitreoretinal degeneration-OD

**West Virginia Department of Health and Human Resources Medical Review, Farukh
Khan, M.D., 6/12/07 (Tr. 474-76)**
Diagnosis:      progressive vitreoretinal degeneration- ODI; DMII; hyperlipidemia; blind left
                eye; numerous complications to diabetes; obesity; gout; chronic situation

depression; left atrial enlargement; aortic valve thickening; moderate concentric left ventricular hypertrophy

| | |
|---|---|
| Ability to work: | Applicant is not able to work full-time at customary occupation or like work; applicant is not able to perform other full-time work |
| Diagnostic Tests: | patient has severe diabetes and all its complications |

**Mid-Atlantic Retina Consultations, Inc., Nabil Jabbour, M.D., 6/11/07 (Tr. 477-83)**

| | |
|---|---|
| Interim History: | "flashing lights" in left eye & mucous discharge for past month; denies any visual changes in right eye |
| Impression: | stable vitreoretinal degeneration-OD; prephthisical-OS |

**Medical Report, Farukh Khan, M.D., 8/20/07 (Tr. 487)**

| | |
|---|---|
| Full Result: | no histal hernia or gastroesophageal reflux in esophagus. No evidence of ulceration or acute abnormality in stomach and duodenum. |
| Impression: | no acute abnormality |

**Medical Records, Syed Haq, M.D., 2/22/07-8/7/07 (Tr. 493-97)**

<u>8/6/07</u>: illegible
<u>7/16/07</u>: rescheduled appt until 8/7
<u>6/21/07</u>: rescheduled appt until 7/16
<u>3/22/07</u>: illegible
<u>2/22/07</u>
reason for consultation: DM type I
Assessment: DM2 uncontrolled


D.      <u>Testimonial Evidence</u>

Testimony was taken at the hearing held on March 21, 2007. The following portions of

the testimony are relevant to the disposition of the case:

EXAMINATION OF CLAIMANT BY ADMINISTRATIVE LAW JUDGE:

Q      What is your date of birth?

A      10/3/58.

Q      So you're how old today?

A      48.

Q      You'll be 49 next month?

23

A       Yes.

Q       How tall are you?

A       5'8-1/2".

Q       And how much do you weigh?

A       About 327.

                    *                   *                   *

Q       Married?

A       No, I'm widowed.

Q       Any children?

A       No.

Q       Driver's license in West Virginia?

A       Yes.

Q       Are you able to drive?

A       I do.  I use to have CDL's.

Q       Okay.  Is you CDL still valid?

A       No.

Q       And any limits on your driving?

A       Yes, I got a Code 2.

Q       What do you understand that to be?

A       Eyeglasses, corrective lenses.

Q       Has that been updated since you had the problem with your vision?

A       No.

Q       Is the Department of Motor Vehicles aware of the fact that you don't have any vision in your left eye or has it changed in any way from your treating physician, your ophthalmologist?

A       No, sir, I haven't told him.

Q       Do you think it would make a difference?

A       Yes, I do.

Q       But there has been no attempt to this point to alter or correct or do anything with respect to your driving and your license currently as far as you know by your doctor?  No limits have been put on your license?

A       No.

                    *                    *                    *

Q       Do you have any problems riding in a car for an hour and 45 minutes?

A       Just in the fog.

Q       I'm sorry, fog?

A       Yeah, the fog just tears me up because I've got so many floaters.

Q       You graduated from high school?

A       Yeah.

Q       Can you read?

A       Yeah - -

Q       Can you write?

A       Yeah.

Q       Can you count money and make change?

A        Yeah.

Q        Have you had any special training after high school?

A        No.

Q        Any military?

A        No.

Q        The record indicates you last worked October the 30th of 2005 and you moved

back to your home town, is that correct?

A        Yes.

Q        But then you said you became disabled on I believe it's February of 2006.

A        Yes.

Q        So you didn't work since October of '05?

A        Right.

Q        You weren't doing anything, you didn't have any job?

A        Not right at the moment, no.

Q        Where did you live before?

A        At Martinsburg.

Q        Okay.  Well, are you able to take me back 15 years and discuss your work

history?

A        Sure.

Q        Okay.  First question is, since February of '06 have you worked for cash or done

any work at all for pay?

A        No.

Q       Have you done any volunteer work?

A       No.

Q       Is your onset date of disability February the 16th, 2006?

A       Yes.

Q       Okay.  But we all agree that between '04 and '06 or '05 and '06 you didn't work?

A       No.

Q       You were unemployed?

A       Yes.

Q       How did you live?

A       I sold my home at Martinsburg for quite a sum of money.

Q       Okay.

A       And the company I use to work for in Martinsburg is now here in Morgantown too, so it put me halfway in between.

Q       But you didn't go to work for them is what you're telling me.

A       No, because this is what happened.

Q       Okay.  But you had a year approximately, right or how much time, October of '05 to February of '06, about six months?

A       Yeah.

Q       And you didn't work during that six months?

A       No, uh-uh.

Q       Tell me what you did beginning with the job you had, what type of work you've done.

A       Well, see I had a truck, a low boy, and I'd pick the equipment up, I'd go out to wherever it was scheduled, dig the basement out of the house, I'd reload my own self and just keep moving it around and when that was ready I'd come back, back fill it and that's what I just done. I usually worked a lot by myself driving a truck, running equipment.

Q       So you were a self-employed truck driver?

A       No, no, I worked for a company.

Q       And what was the company?

A       A & A Homes.

Q       Okay. And what did you - - were you over the road, interstate commerce or just local?

A       Just local.

Q       Okay. And did you have to load and unload the truck?

A       Oh, yeah.

Q       What did you use?

A       Well, I had - - I just unloaded it off of the low boy with the loader, 953 loader.

Q       Okay. Is that kind of like a forklift type?

A       No, no, no, no, it's a track loader.

Q       Track loader?

A       Uh-huh.

Q       And what would you say the heaviest part of your job was in terms of lifting, carrying weight?

A       Probably chaining it down.

Q      All right.  And you had no earnings at all in '06?

A      No.

Q      Okay.  I was trying to see who the - - what your earnings record indicated your employers were.  Were you working for various construction and different types of companies operating the truck or did you have the same company for the whole 15 years?

A      Same, same company.

Q      Well, you know, I'm looking at - - I was looking at some of your earnings records starting with - - well I guess I'm going backwards in time here, I don't need to go back that far. In 2005 $22,000, so you're definitely working full-time at that point.

A      Yeah, until the housing market just folded.

Q      Okay.  So pre-fab homes or - -

A      No, no, stick built.

Q      Stick built.  So what were you transporting, lumbar?

A      No, no, I always just transported the truck.  Of course the truck I was using was the dump truck and I could go get my own gravel, whatever I needed.

Q      Okay.  And then were you also involved in construction?

A      No, just that part.

Q      And you said the heaviest part of that was what?

A      Chaining it down with the booms and the chains when I was moving.

Q      And Ayers  (Phonetic) Builders was your primary employer?

A      It was A&A Homes now, at one time it was Ayers Builders.

Q      Right.

A       Then A&A went together and it's Ayers and Ayers.

Q       Yes, it changed to A&A.  Was there a period where it was all A&A or Ayers?

A       No, there was a period when it was called Ayers Builders.

Q       All right.  And your job was simply to - -

A       I was the equipment operator, I was a truck driver.

Q       Okay.

VE      Judge, can we - - did he just deliver the equipment or did he actually do the digging of the basements?

ALJ         I say he said he did it.

CLMT        I done it, yeah, I done it.

VE          Okay.  That's what I wanted to make sure.

BY ADMINISTRATIVE LAW JUDGE:

Q       Did you use a back hoe?

A       No, a track loader.

Q       A track loader?

A       Uh-huh, I run - -

Q       To dig a basement?

A       Yeah.

Q       Okay.

A       And the back hoe, they had a back hoe too and I'd sometimes come back and put the water lines, dig the water lines, of course I had help that worked in the ditch.

Q       Back hoe?

A      Yeah.

Q      And you did that routinely for the whole period to time in question?

A      Yes.

Q      For at least 15 years if not longer?

A      Yes, yeah.

Q      Okay.  All right.  Tell me what keeps you from working?  In your application you said that you became disabled because you have diabetes, heart problem, gout and then you developed a detached retina.

A      Right.

Q      Anything else?  Is that pretty much it?

A      The depression from it, I mean.

Q      All right.  So you have depression as well?

A      Oh, yeah.

Q      Okay.

A      I started work when I was 17 years old.  Now I have to go and ask for food stamps, I have to ask for help from churches to pay my electric bill.  That would depress anyone in this room.

Q      All right.  Well let's help me understand.  First of all, the diabetes, is it insulin dependent or do you take medication?

A      No, I'm insulin dependent and the medication, pills.

Q      And how long have you been a diabetic?

A      I first noticed it in 2003.

Q      And when did you start becoming insulin dependent?

A      The first year, around the first of the year.

Q      So it didn't affect your ability to work up until you were taking insulin, you were controlling your diabetes and that's how you regulate your blood sugar, isn't that correct?

A      It never did what you would say control it.

Q      How many times do you inject yourself a day?

A      Two.

Q      How many times do you test your blood sugar?

A      Sometimes once, sometimes twice.

Q      Is that appropriate for a diabetic that's insulin dependent, sir?

A      No, no, sir, it's not.

Q      All right.  What else, you have gout?

A      Yeah.

Q      How long have you had that?

A      I was guessing since probably 1987.

Q      Okay.  So you worked quite a few years with gout?

A      Oh, yeah.

Q      How did you control it and what is it about gout that causes you a problem that didn't cause you a problem when you were working?

A      I think age.  Of course if you get it keeps working the same joint and when I get it in the ankles or in my wrist I'm done for.

Q      Okay.  And then you said you have depression.

A       Yeah.

Q       Who is your psychologist or psychiatrist?

A       I never did go to one, I went to Dr. Kahn (Phonetic).

Q       Is he a psychologist?

A       No, he's a medical doctor.

Q       Okay.  Are you in any type of therapy for your mental condition?

A       Just Zoloft.

Q       Well, do you go see a therapist?

A       No.

Q       Have you ever been hospitalized because of your depression?

A       No.

Q       All right.  So your current status is what depresses you, but you haven't sought medical attention for it other than medication?

A       That's right.

Q       And that's being provided by your treating physician?

A       Yeah.

Q       Okay.  And is it depression?

A       Yeah.

Q       Do you have any medical records evaluating the scope or the degree of the depression?

A       No.

Q       You're just taking Zoloft?

A      Yeah.

Q      And then all of a sudden in February of '06 you found yourself in Mann

(Phonetic) General, the ER with a detached retina in your left eye, is that right?

A      Yes.

Q      And then who is your treating eye doctor?

A      Dr. Jabor (Phonetic).

Q      And what did you ultimately have to do to repair that detached retina?

A      I went through seven surgeries in 2006 and the first '07 plus four laser.

Q      Okay.  And do you know the current vision limit in your eye, your left eye?

A      Just like perceptive is all.

Q      What is a petopsis (Phonetic), or do you know what that means?

A      A what?

Q      Petopsis?

A      I have no idea.

Q      Do you have a drooping eyelid over your left eye?

A      It is now, yeah.

Q      Does it restrict your vision in your left eye or you don't really - -

A      I don't even notice it.

Q      Okay.  You have no vision in your left eye?

A      No, none whatsoever.

Q      Is your right eye 20/25?

A      Yes.

Q       Okay. Would you consider it good?

A       Fair, you know, I can see.

Q       All right.

A       But I've got a lot of floaters in it.

Q       All right, in your left?

A       Right.

Q       Right. All right, what else, what else is your disability?

A       Well with an eye condition you automatically lose your CDL operators automatically with one eye.

Q       Well I understand. What else limits you? Do I have a good understanding - - because you said something about your heart. I don't know, what is your heart problem?

A       I've got a thickening of the right valve or the left valve and an enlargement. Of course with my eye I can't judge distance at all.

Q       Okay. Have you had - - other than your eye surgeries have you had any other surgeries?

A       Kidney stone.

Q       Anything else?

A       No.

Q       When was your last eye procedure?

A       The operation?

Q       Uh-huh. You said you had several.

A       Yeah.

Q       When was the last one?

A       I'm thinking it was around February of this year.

Q       And you don't have to have anymore?

A       No, there's nothing you can do.

Q       Okay.  Do you have any pain from any of your conditions?

A       Just the gout when I get it.

Q       Okay.  Do you take pain medication?

A       Yes.

Q       What do you take?

A       I take Tylenol, Darvocet, and there is another one, I can't think of the name of it,

I'd have to look in the list.

Q       What is that for?

A       It's for pain.

Q       Where?

A       Wherever you take your gout when you got it.

Q       So the gout is not constant?

A       No, it's not constant, no.

Q       Comes and goes?

A       Comes and goes, yes, sir.

Q       And do you only take the Darvocet or the Tylenol when it flares up?

A       Yes, sir.

Q       How often does it flare up?

A       It can happen one to two times a month or it can happen more.

Q       And where is it in your legs?

A       Oh, I can take it anywhere, wrist, elbow, knees, ankles, feet, bottom of my toes.

Q       Okay.  And do you consider your weight to be overweight?

A       Oh, yes.

Q       Do I have a pretty good understanding then of all of your conditions?

A       That's pretty much it.

Q       Okay.  And your treating doctor, you're finished with Jabor?

A       No, I go back every three months for my right eye.  Unless anything happens then I'm to go immediately and I've got a number I carry at all times.

Q       Who is your treating doctor again, Kahn?  No?

A       Medical, yes.

Q       Dr. Kahn?

A       Yeah.

Q       Where is he located?

A       In Elkins.

Q       And how often do you see him?

A       I'm suppose to go every 30 days.

Q       Do you?

A       Sometimes.

Q       Okay.  Does he renew your prescriptions?

A       Yes.

Q    This is a pretty extensive list of medication, do you take them all every day?

A    Yeah, every day.

Q    Every day.  Most of them are diabetes and insulin type medications?

A    Yes.

Q    Some are cholesterol.  Do you have any problem with your blood pressure?

A    Oh my, yes.

Q    You didn't mention that.  Why didn't you tell me about your blood pressure?

A    I never even think about it.

Q    Is it controlled?

A    No.

Q    In other words, your blood pressure medicine doesn't help you at all?

A    Not really, no.

Q    Okay.  And who is Dr. Hague (Phonetic), Sieb (Phonetic) Hague?

A    Hague, he's a diabetes specialist.

Q    Okay.   How often do you see him?

A    About every two months.  Him and Dr. Kahn coordinate together.

Q    Okay.  How far can you walk on level ground?

A    I'm pushing at a half a mile.

Q    How long can you stand?

A    Fifteen to twenty minutes.

Q    Can you bend forward at the waist?

A    Yeah, it's rough, but I can, yes.

Q       Could you squat by bending your knees straight down?

A       Yeah, same thing.  My size.

                    *                *                *

Q       If you laid your hands on a hot stove or something hot would you know it?

A       Oh, yeah.

Q       Okay.  And you said you're right-handed?

A       Yes.

Q       Can you hold a fork and spoon and dress yourself with your hands and fingers?

A       Yeah.

Q       How much can you lift on a regular basis today?

A       I don't know, maybe 100 pounds.

Q       You could do 100 pounds today?

A       I never tried, I don't know, maybe 50.

Q       My question was, how much do you lift and carry on a routine basis today?

A       Oh, today?

Q       Yeah.

A       I haven't picked up nothing heavy at all no more.

Q       How about during the period that you've alleged you became disabled from

February '06 to the present, how much would you lift and carry on a routine basis?

A       Oh, I wasn't suppose to lift over a milk jug.

Q       Okay.  How much would that be?

A       Eight pounds.

Q    How about sitting like you are now, how long are you able to sit?

A    Two, three hours, an hour.

Q    Does your mental depression affect your memory?

A    No.

Q    Does it affect your ability to follow a story or television?

A    Yes.

Q    How does it affect your TV?

A    I just lose concentration on it.

                    *              *              *

Q    Do you have problems with crowds of people?

A    Yeah.

Q    How many make you uncomfortable?

A    I guess it's just according to how much noise, how much was going on.

Q    Do you have problems with strangers?

A    Pretty much, yeah.

Q    But no formal mental health treatment?

A    No.

Q    Just the Zoloft, is that right?

A    Yeah.

Q    Do you have any side effects from any of your medications, including Zoloft?

A    No, not that I know of.  Some of it makes you drowsy, if that's what you mean.

Q    Which one?

A       I would say the pain medicine definitely makes you drowsy.

Q       And that's which one?

A       The Darvocet really does.

                    *               *               *

Q       Okay.  Problems breathing?

A       Yeah.

Q       What makes it worse?

A       If I get really active.

                    *               *               *

Q       Now obviously before you had your detached retina your vision was pretty

decent, would you say?

A       Oh, yes.

Q       But you even then wore glasses?

A       Yes.

Q       And now with your detached retina you represent to me that you have no vision in

your left eye?

A       None whatsoever.

Q       And that's your testimony?

A       Yes.

Q       But the right is 20/25 or pretty good?

A       Yeah, plus I've got the massive web floaters in it.  Like when I'm looking at you I

can see spots and a line coming down from it.  And they're always constantly moving, they're

never in the same place.

Q    Do you wear a hearing aid?

A    No.

Q    Any difficulty hearing my questions today?

A    No.

                    *              *              *

Q    And then your testimony was that you sold your home in Martinsburg and had a substantial sum from that, is that correct?

A    Yes, uh-huh.

Q    And you haven't bought a home in your hometown?

A    Yes.

Q    You've bought a home?

A    Yes.

Q    And that's in where, I believe Bowden, is that correct?

A    Yes.

Q    How many hours a night do you average sleeping?

A    Last night about two hours.

Q    Is that your average every night?

A    Yeah, it can average from two to four.   I'm up off and on all night long.

Q    And what time would you find yourself out of bed for the last time in the morning?

A    If I get up at 6:00 I stay up.

Q        If you don't get up at 6:00 what time do you usually get up?

A        Around 3:30 every morning to go to the bathroom.

Q        My question to you was on an average, what time do you find yourself out of bed every day?  Does it vary?

A        It varies to about 7 o'clock and I'm always up.

Q        Can you take a shower or a bath, shave, trim your mustache, perform your personal hygiene requirements, including toileting without help or assistance?

A        Oh, yeah.

Q        Who does the cooking for you?

A        I do but it's a lot of microwave stuff.  Oh, I can fix a hamburger or something, your know.

Q        Do you eat out a lot?

A        Yeah, at my sisters.

Q        Okay.   So you do go to your sisters.  How often would you go to your sisters?

A        A couple times a week.

Q        Okay.  Now what will you do on a typical day, you're up at 6:00, sometimes you said 3:00 in the morning, sometimes 7:00, how will you spend your time, what will you do?


A        Usually fix me a pot of coffee the very first thing.  I can sit around watch a little TV.  And usually I'll end up going outside and going somewhere.

Q        Well, you said you don't watch TV much because you lose concentration, so are you spending pretty much all day watching TV?

A       No.

Q       Okay.  When you go somewhere where do you go?

A       It's within the family.

Q       Do you visit family?

A       Yeah.

Q       Do you walk, drive?

A       Drive.

Q       Drive.  Is this every day?  You said you only eat with your sister a couple times a
week.

A       I've got a brother that doesn't live too far away.

Q       Okay.  Do you see your brother every day?

A       Oh, every day.

Q       What do you guys do together?

A       He'll take me fishing or riding around.

Q       Okay.  So you fish as a hobby?

A       Yeah, I try to, yeah.

Q       Okay.  Stand on a bank or go out in a boat?

A       On a stand or sit a seat.

Q       You don't wade out and do trout fishing?

A       No, because the rocks, I just can't.

Q       But you've had no difficulty getting a hunting and fishing license or at least a
fishing license for every year since you've lived in West Virginia?

A        I've had them since I was 15 years old.  Where I live it's a way of life.

Q        You had them in '04?

A        Yeah.

Q        '05?

A        Yeah.

Q        '06?

A        Yes.

Q        '07?

A        Yes.

Q        How many times have you been fishing this year?

A        Probably seven or eight time.

Q        No problems seeing it?

A        Well I have time, you know, hook and - -

Q        Tying the lures on?

A        Yeah.

Q        You can do that all right?

A        And I can't judge the distance like I use to.  I've got two boats, I use to fish all the time but now I haven't even had them out for two years.

Q        You don't take your boats out at all?

A        No.

Q        No hunting?

A        Yeah, I hunt.

Q       Deer?

A       Yeah.

Q       You still hunt.  Did you hunt last year?

A       I hunted last year but my hunting might be different from yours.  All I have to do is open the door.

Q       You've got a permit to hunt with a 4-wheeler?

A       No.

Q       Oh, I don't know what you're saying.  How do you hunt by just opening a door, you mean out your back door?

A       Yes.

Q       Okay.  But you're still able to hunt?

A       Yeah, I mean, if that's what you call it.

Q       Here's what I'm trying to figure out, can you see to point the gun at the animal?

A       Yeah, with the scope, yes.

Q       And you can site it?

A       With the scope, yeah.

Q       Do you site with your left eye or your right eye?

A       Right eye, because my left is blind.

Q       Okay.  What have you given up?  What don't you do anymore that you use to?

A       I use to go to work.

Q       Well, I understand, you wouldn't be applying for benefits if you were still working, would you?

A       No.

Q       What have you given up, what activities have you given up?  You still hunt, you still fish.

A       Well, that's just about everything I ever really do.

Q       You didn't have any other hobbies or activities?

A       No, I didn't.

Q       Okay.  Do you belong to any clubs, organizations, churches, lodges or attend meetings?

A       No, I don't.

Q       The home in which you live, is it one floor, all one level?

A       No, I've got a basement.

                    *               *               *

EXAMINATION OF CLAIMANT BY ATTORNEY:

Q       Earlier in your testimony you said your sugar levels were not stable.  Do they tend to run high or low?

A       Usually high.

Q       Okay.  How often do they run high and how high are we talking?

A       I've been averaging about 360 here lately all day.

Q       Okay.  For about how long?  When you say lately how long has it been?

A       For over a month.

Q       Okay.  How do you feel when your sugar is that high?

A       Oh, you get very moody, shaky, vision, you can tell it in - - I can now in my eye

when it's really high.

Q      Okay.  How long do those symptoms last?

A      They can last all day.

Q      Okay.  what's the minimum amount of time those symptoms can last?

A      Maybe a half a day if you relax, take your medication.

Q      Okay.  And by relax what do you do to relax at that point?

A      Just sit down in a chair, recliner and just close my eyes and relax.

Q      Okay.  What about do your sugar levels ever go too low?

A      Oh, yes.

Q      Okay.  And how low?

A      The lowest I ever had was 71.

Q      Okay.  How often does that happen where your sugar level is too low?

A      It can happen, there's really no set time for it to do it, if it does you really know it, you get so nervous you just go into shaking and like I say, you can go back to the vision again.

Q      Okay.  How long do those symptoms last?

A      The low sugar is worst of all, when I take it, it can last all day or into the next day almost, it just gives you a sick feeling all over.

Q      Okay.  And how do you generally spend your time when your sugar is low?

A      Get something to eat sweet and just kind of relax again.

Q      Okay.  Now, back to your vision, do you have eye fatigue?

A      Oh, yes.

Q      What causes you to have eye fatigue?

A       They're starting to say it's the sugar in the one eye that I only got now because of the  floaters, the so many floaters that's in it.

ALJ            I don't see a diagnosis of diabetic retinopathy, is that where you're headed, Ms. Larosa?  I don't see a physician that said he has retinopathy?

ATTY          No, that's right, that's correct.

ALJ            Okay.

BY ATTORNEY:

Q       I was wanting to see if like reading or even watching TV causes eye fatigue, if you ever have to rest your eyes?

A       Oh, yes.

Q       Okay.  How long could you read or watch TV before you have to rest your eyes?

A       Reading, about five minutes at the max.

Q       Okay.

A       TV, I can watch TV maybe for a half hour if it's clear TV.

Q       Okay.  How long do you generally have to rest your eyes after either reading or watching TV?

A       Oh, like if it's reading I've got to just close them after five minutes of reading probably for two or three minutes.

Q       Okay.  Now, I notice that you're also on a medication for migraines.

A       Yes.

Q       Are the headaches related to the vision?

A       Yes.

Q       How often are you having the headaches?

A       Oh, I have them once or twice a week.

Q       How long do they typically last?

A       They can last up to all day.

Q       And again, generally how do you spend your time when you have one of the headaches with the migraines?

A       Oh, if it's a migraine I have to go lay down and everything has to be deathly quiet.

*               *               *

EXAMINATION OF VOCATIONAL EXPERT BY ADMINISTRATIVE LAW JUDGE:

Q       Would you classify his past relevant work or the work that he's done in the past 15 years?

A       Yes, his work as an equipment operator would be medium and skilled and there would not be any transferable skills to a lighter exertional level.

Q       Okay.  The vocational profile of Mr. White is between the ages of 47 and 49.  He won't be 49 until next month, so there's no change in age category under our regulations. He has a high school education and the past medium, skilled work that you've identified with no transferable skills to other exertional levels.  The state agency in this case and a prior hypothetical indicated that an individual could do light work; lift 20 pounds occasionally, 10 pounds frequently; but never climb any ladders, ropes or scaffolds, crouch or crawl.  Such an individual could occasionally climb ramps and stairs, balance, stoop and kneel.  Visually

consider that there is a limitation in depth perception and in field of vision with the left eye. And because of an eyelid droop he's also limited further by the fact that his left eyelid on this hypothetical person would obstruct also any vision if any exist. But the fields of vision, as I understand it, is limited and restricted in all quadrants. Right vision, consider this person has a 20/25 visual field. As far as the environmental limits, avoid concentrated exposure to temperature extremes, of heat and cold and moderate exposure to the hazards of working around moving machinery and unprotected heights. Now, with such a hypothetical, would this person be able to do the equipment operator work that the claimant did in the past?

A        No, Your Honor.

Q        Using your knowledge and experience as a Vocational Expert and considering the regulations of Social Security, would you be able to identify any jobs in the national or regional economy that such an individual could perform with that hypothetical and of course the region to be defined by you?

A        Yes, Your Honor, the region we're using is West Virginia, eastern Ohio, western Maryland and western Pennsylvania. That hypothetical individual with the light level I believe could function as an office assistant, light, 150,000 nationally, 1,850 regionally. Or as an officer cleaner, light, 100,000 nationally, 8,000 regionally.

ATTY        How many nationally?

VE        400,000.

ATTY        Okay.

BY ADMINISTRATIVE LAW JUDGE:

Q        If an individual is limited because of depression to unskilled work activity, would

that affect your testimony in any way?

A     No, both those positions are unskilled, Your Honor.

Q     If we reduce the exertional level to sedentary, lift 10 pounds occasionally, 5 pounds or less on a frequent basis, with the same limitations with respect to climbing, balancing, stooping, kneeling.  I previously assigned it light.   The environmental as previously discussed at the light hypothetical, the visual limits as previously discussed at the light level.  Would you be able to identify any sedentary jobs such an individual could perform?

A     Yes, Your Honor, that hypothetical individual at the sedentary level I believe could function as an assembler, sedentary, 149,000 nationally, 1,450 regionally.  Or a general sorter, sedentary, 50,000 nationally, 650 regionally.

Q     Now if the testimony of Mr. White is considered completely credible and his medical evidence supports the fact that he cannot do any job at any exertional level, whether it's medium as he's done in the past, light as you've indicated there were jobs available, or sedentary.  And his non-exertional limitations of pain and depression affect his ability to maintain attention and concentration or pace to perform the full eight hour work day five days a week, forty hours a week due to absenteeism and pain and other distractions.  If that would be the case would there be any jobs such a person could do?

A     No, Your Honor, that would eliminate a competitive work routine at all levels.

*          *          *

E.     Lifestyle Evidence

The following evidence concerning Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how

Claimant's alleged impairments affect his daily life:

- Claimant is 5'8-1/2" and weighs 327 pounds (Tr. 38)

- drives and has a WV driver's license with a Code 2 restriction for eyeglasses, corrective lenses (Tr. 38-39, 60)

- has not informed the DMV of his current blind condition in his left eye (Tr. 39)

- has trouble driving in foggy conditions (Tr. 39-40)

- can walk for half of a mile (Tr. 53)

- can stand for 15-20 minutes at a time (Tr. 53)

- can bend and squat with some difficulty (Tr. 53)

- can hold a fork and knife (Tr. 53)

- can dress himself (Tr. 53-54)

- can lift 50-100 pounds (Tr. 54)

- able to sit for hours (Tr. 54)

- depression does not affect memory (Tr. 54)

- depression affects ability to follow a story and television (Tr. 54-55)

- can be uncomfortable in large crowds (Tr. 55)

- averages two to four hours of sleep each night (Tr. 58)

- is able to care for himself (personal hygiene) (Tr. 58-59, 149)

- fixes his own meals (Tr. 59, 150)

- visits his sisters a couple times each week (Tr. 59, 152)

- typical day includes fixing coffee, watching television, and going outside (Tr. 59, 148)

- is still able to fish (Tr. 60-61, 152)

- is still able to hunt (Tr. 61-62, 152)

- goes places with his brother (Tr. 148)

- does housework (Tr. 150)

- does laundry (Tr. 150)

- goes grocery shopping once per week (Tr. 151)

- is able to follow written and spoken instructions (Tr. 153)

### III. The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant argues that the ALJ's decision to deny the Claimant DIB and SSI is not supported by substantial evidence because it fails to properly credit the Claimant and his treating physician's statements and opinions. Claimant also argues that the ALJ erred as a matter of law by finding that Claimant is capable of work that exists in substantial numbers in the national economy.

Commissioner contends that the ALJ's decision is supported by substantial evidence because the Claimant failed to prove that he is disabled as defined by the Act. Commissioner argues that the ALJ correctly found the Claimant "not entirely credible," properly afforded little weight to the physicians' opinions, and posed a complete hypothetical question to the VE based on impairments supported by the record.

B.    <u>Discussion</u>

I.    Whether Substantial Evidence Supports a Finding that Claimant was not Entirely Credible.

Claimant argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to cite specific reasons for discrediting Claimant's testimony. Commissioner

contends that the ALJ followed the two-step analysis outlined in the regulations and correctly discredited Claimant's testimony.

This Court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3). "Substantial evidence" is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). "Substantial evidence" is not a "large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 664-65 (1988); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The decision before the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 2001)). The ALJ's decision must be upheld if it is supported by "substantial evidence." 42 U.S.C. §§ 405(g), 1383(c)(3).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (7th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). "We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) (citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

Claimant argues that the ALJ offered insufficient reasoning for discrediting Claimant. Claimant relies on two Fourth Circuit cases as well as two non-binding cases in asserting that the ALJ failed to specifically state the reasons for discrediting Claimant. Claimant is correct in his assertion of the law; however, the cases are distinguishable from the case at bar. Claimant relies on Smith v. Heckler, 782 F.2d 1176 (4th Cir. 1986). The Fourth Circuit in Heckler quoted an earlier opinion, which held that "an ALJ has a 'duty of explanation' when making determinations about the credibility of a claimant's testimony." Id. at 1181 (citing Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985)). In finding that the ALJ failed to fully explain his reasoning for discrediting the claimant, the Court found that "the ALJ did not explain *at all* his reasons for classifying Smith's past relevant work in a lower classification than that supported by the claimant's testimony." Id. (emphasis added). Similarly, the Court in Rohrberg v. Apfel, stated that a "credibility determination must be supported by substantial evidence and the ALJ must make specific findings as to relevant evidence she considered in determining to disbelieve the claimant." Rohrberg v. Apfel, 26 F.Supp.2d 303, 309. The Court found that the "ALJ did not state any specific reason for finding that Rohrberg was not a credible witness. . . . The ALJ made no reference to Ms. Rohrberg's demeanor, evasiveness or combativeness, nor to any other observations indicating a basis for discrediting her testimony, *such as contrary medical evidence or observation of activities which might reflect negatively on her credibility*." Id. at 310 (emphasis added).

The Court's review is limited to whether the ALJ's decision is supported by substantial evidence. In coming to his conclusion that Claimant's "September 2007 hearing testimony and other attributed assertions of record concerning the intensity, persistence and limiting effects of

his impairment-related symptoms are not entirely credible" (Tr. 22), the ALJ stated specific

reasons and had substantial evidence to discredit Claimant's assertions regarding the intensity,

persistence and limiting effects.  First, the ALJ explained that Claimant's onset date of February

16, 2006, was more than three months after Claimant had already stopped working.  (Tr. 22)

"Thus, the claimant did not cease performing work activity because of any impairment-related

inability to continue."  (Tr. 22).  Second, the ALJ explained that Claimant informed Dr. Beard he

had been diagnosed with diabetes in 2004; however, Claimant's annual earnings in 2004 and

2005 "are generally consistent with the annual earnings he had reported in previous employment

years.  Thus, the claimant's diabetes mellitus does not of itself appear to have imposed any

symptoms that precluded the claimant's ability to perform and sustain his customary profession

as a truck driver/ heavy equipment operator."  (Tr. 23).  Third, the ALJ discredited Claimant's

statements as to disability because "claimant's subsequent activities and statements indicate

otherwise."  (Tr. 23).  The ALJ noted that in a subsequent disability form completed in April

2006, Claimant included hunting and fishing as his hobbies and indicated, in response to a

question as to the frequency he engaged in such activities, that "hunting season was 'over' and

that he could not see to use a hook in order to fish. . . . he did not hunt because he could not see

and that, with regard to fishing, he also had trouble with 'balance & judgment in distance.'"  (Tr.

23).  However, the ALJ notes, "by way of contrast, the claimant testified at his September 2007

hearing that he often went fishing with his brother.  He stated that he had gone about seven or

eight times during the year. . . . He then admitted that he had gone deer hunting the preceding

year (presumably, during an autumn month in 2006).  The claimant went on to state that, in order

to hunt, he only had to open the door of his house.  He stated that he could use a scope and sight

game with his right eye." (Tr. 24). Fourth, the ALJ notes that Claimant testified he still possessed a valid operator's license, wore glasses but "his physician had put no restrictions on his 'regular' driver's license, and remained able to watch and enjoy television. (Tr. 24). Last, ALJ noted that Claimant "had gout off and on and that he only took pain medications during 'flare-ups.'" (Tr. 24). In weighing the evidence, the ALJ ultimately concluded that "claimant's ongoing abilities to drive and to enjoy hunting, fishing, television and engaging socially tend to contraindicate any 'total' mental or physical disability based upon such bases/conditions as the claimant has alleged." (Tr. 24).

The Court finds that the ALJ had more than a mere scintilla of evidence and appropriately discredited Claimant.

II.     Whether the ALJ Failed to Adequately Include the Limitations Presented by Claimant's Impairments in Hypotheticals to the VE.

Claimant argues that the ALJ failed to adequately include the limitations presented by Claimant's impairments in hypotheticals to the VE, and as a result, the VE mistakenly identified several jobs that existed in significant numbers in the national economy that Claimant could perform. Claimant bases this argument on the ALJ's failure to give appropriate weight to the medical evidence and improperly discount Claimant's credibility. Commissioner contends that the ALJ posed proper hypotheticals and properly evaluated and gave little weight to two treating physicians.

The Fourth Circuit Court of Appeals has held, albeit in unpublished opinion, that while questions posed to the vocational expert must fairly set out all of the Claimant's impairments, the questions need only reflect those impairments supported by the record.   Russell v. Barnhart, 58

Fed. Appx. 25, 30; 2003 WL 257494, at 4 (4th Cir. Feb. 7, 2003)[5].  The Court further stated that

the hypothetical question may omit non-severe impairments but must include those that the ALJ

finds to be severe.  Id.  Moreover, based on the evaluation of the evidence, "an ALJ is free to

accept or reject restrictions included in hypothetical questions suggested by a Claimant's counsel,

even though these considerations are more restrictive than those suggested by the ALJ."  France

v. Apfel, 87 F. Supp. 2d 484, 490 (D. Md. 2000) (citing Martinez v. Heckler, 807 F.2d 771, 774

(9th Cir.1986)).

The ALJ is afforded "great latitude in posing hypothetical questions."  Koonce v. Apfel,[6]

166 F.3d 1209; 1999 WL 7864, at 5 (4th Cir. 1999) (citing Martinez, 807 F.2d, at 774).  The ALJ

need only pose those questions that are based on substantial evidence and accurately reflect the

Claimant's limitations.  Copeland v. Bowen, 861 F.2d 536, 540-41 (9th Cir. 1988); see also

Hammond v. Apfel,[7] 5 Fed. Appx. 101,105; 2001 WL 87460, at 4 (4th Cir. 2001).

The ALJ did not pose an improper hypothetical to the VE.  Claimant argues that VE

posed an improper hypothetical because "the ALJ asked the VE about the job potentials if the

testimony of the claimant was completely credible, if the medical evidence supported the

---

[5]  This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[6] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

[7] This Court recognizes that the United States Court of Appeals for the Fourth Circuit disfavors citation to unpublished opinions.  I recognize the reasons for that position and acknowledge it.  Unfortunately, there is not a better indicator of what its decision might be in this regard.

exertional limits, and if his depression affected his ability to concentrate."[8]

First, as to Claimant's credibility, the Court will forego another complete credibility analysis as it has previously found the ALJ properly and adequately explained his reasons for discrediting Claimant. Claimant has failed to show any evidence suggesting that the ALJ's credibility determination was patently wrong. Because Claimant had the burden, the Court cannot reverse the ALJ's credibility determination. .

Second, as to exertional limits, the ALJ did not err in discrediting the supportive evidence of record. First, Claimant cites no specific supportive evidence of record, so the Court is unable to determine to which part of the record Claimant is referring. Second, if Claimant is referring to medical records supporting Claimant's testimony regarding migraines and depression affecting Claimant's ability to concentrate, the Court is unable to find any medical evidence of record supporting the assertion. Thus, the ALJ's decision to discredit Claimant's subjective claims of exertional limits is supported by substantial evidence.

Third, as to discounting medical opinions, the Court will forego another complete analysis as it subsequently finds that the ALJ properly evaluated and afforded little weight to two treating physicians.

Because the ALJ is afforded great weight in posing hypotheticals and need only include those impairments supported by substantial evidence, the ALJ did not fail to adequately include all Claimant's impairments in hypotheticals to the VE.

III.   Whether the ALJ Gave Appropriate Weight to the Medical Evidence Submitted by Treating Physicians.

_____

[8] Doc. No. 15, P. 10.

Claimant argues that the ALJ's decision was not supported by substantial evidence because he failed to afford adequate weight to letters submitted by two of Claimant's physicians. Specifically, Claimant argues that the ALJ failed to give appropriate weight to the doctors' letters because they coincide with each other. Commissioner argues that the ALJ properly evaluated the doctors' letters and properly afforded less than controlling weight.

All medical opinions are to be considered in determining the disability status of a claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as RFC and disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1)-(3), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. Id. The opinion of claimant's treating physician is entitled to great weight and may only be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources, when the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques, and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §416.927(d)(2). See Craig, 76 F.3d at 590 (holding that a treating physician's medical opinion must be given controlling weight only when it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). While the credibility of the opinions of the treating physician is entitled to great weight, it may be disregarded if there is persuasive contradictory evidence. Evans, 734 F.2d at 1015. To decide whether the

impairment is adequately supported by medical evidence, the Social Security Act requires that impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Heckler v. Campbell</u>, 461 U.S. at 461; 20 C.F.R. §§ 404.1508; <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990).  Courts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist.  20 C.F.R. § 404.1527 (2005).  Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.  <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001).  However, "although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not require that the testimony be given controlling weight."  <u>Id.</u> (citing <u>Hunter v. Sullivan</u>, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).          Claimant argues that the ALJ discounted the opinions of Drs. Gongola and Jabbour because they drafted opinion letters for Claimant that contain similar language and were written on consecutive days.  Claimant is wrong.  The Court's review of the ALJ's opinion reveals that the ALJ's decision to afford little weight to the letters was supported by substantial evidence, which the ALJ extensively lists in his opinion.

First, the ALJ affords little weight to the doctors' opinions because Claimant's own testimony contradicts a claim of total disability.  (Tr. 25-27).  Claimant admitted that as early as April 2006 he "watched television, made coffee, walked around in his house and driveway, went

out to do things or go places with his brother and sister, prepared simple meals, swept his floor, did his laundry and went grocery shopping." (Tr. 26-27). Second the ALJ cites contradictions in the doctors' reports. Though Dr. Gongola opined in her letter dated January 22, 2007, that Claimant qualified for full disability, she indicated in her report dated February 14, 2007, that

> the claimant had no significant right eye visual impairment, would experience no difficulty concentrating right eye vision on an object for an appreciable time, was unlikely to experience vision-related headache and would not be likely to experience double or tunnel/gun barrel vision. She could only speculate ("perhaps") whether the claimant's "monocular" vision interfered with his ability to read. She opined that he was capable of reading and carrying on tasks that required careful attention to. Moreover, she offered opinion that the claimant's eye condition/"disorder" imposed no restrictions whatsoever upon the amount of weight he could lift, or as to doing any "bending, stooping or crawling." She wrote that, "if his right eye begins to detach his activities would be restricted."

(Tr. 27). The ALJ ultimately concluded that "Dr. Gongola's written opinions of February 14, 2007, essentially negate the reliability of any earlier projection on her part to the effect that the claimant had any such need for 'recuperation and positioning' as would preclude his ability to work for a fully year." (Tr. 27). The ALJ also relies on the differences between Dr. Gongola's assessment on February 14, 2007, and Dr. Jabbour's reports, noting that in contrast to Dr. Gongola's report, Dr. Jabbour opined Claimant would have difficulty concentrating on an object for any appreciable amount of time. (Tr. 27). Third, the ALJ indicates the inconsistency between the doctors' reports and Claimant's testimony. "However, the claimant's indicated ability to enjoy television renders Dr. Jabbour's ascribed limitations even more speculative and, accordingly, unreliable." (Tr. 27).

The ALJ properly evaluated the doctors' letters and had substantial evidence to afford little weight to the letters. Therefore, the ALJ did not err by failing to give proper weight to the medical evidence submitted by the two treating physicians.

## IV.  Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because there was substantial evidence for the ALJ to discredit Claimant's testimony and afford less than controlling weight to two treating physicians' opinions, and the ALJ properly posed a complete hypothetical to the VE.

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reason set forth above.


Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should be submitted to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 1, 2009

/s/ *James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE